**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CPG INTERNATIONAL LLC,** | : | **No. 3:15cv176** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **WILLIAM NICHOLAS GEORGELIS,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court for disposition is plaintiff's request for a permanent injunction, asserting the defendant breached an agreement not to compete and misappropriated trade secrets when he resigned from his position as a sales manager and took a job with a competitor. For the reasons below, the court will grant plaintiff's request in part and deny it in part.

**Background**[1]

Defendant William Georgelis (hereinafter "Georgelis" or "defendant") began employment with TimberTech, a manufacturer of

---

[1] On February 3 and 4, 2015, the court held a non-jury trial on the merits of plaintiff's request for injunctive relief. This Background section includes the court's relevant findings of fact based on the evidence presented. Citations to "Tr. I" refer to Trial Transcript, Vol. I, February 3, 2015 (Doc. 34). Citations to "Tr. II" refer to Trial Transcript, Vol. II, February 4, 2015 (Doc. 35).

certain building materials, on August 6, 2003, as a Retail Sales Manager. (Tr. II 73:10-12; Tr. I 22:5-13; Pl. Ex. 4).  As a condition of employment, TimberTech required Georgelis to sign an Agreement Regarding Competition and Confidential Information (hereinafter "Agreement").  (Tr. II 73:3-12; Pl. Ex. 9).  Georgelis signed the Agreement.  (Pl. Ex. 9).  In 2013, TimberTech merged with Plaintiff CPG International LLC (hereinafter "CPG").  (Tr. II 67:2-4; Tr. I 20:25-21:3).  By its terms, the Agreement was assigned to CPG as TimberTech's successor.  (Pl. Ex. 9 ¶ 10).

As a sales manager for TimberTech, and later CPG, Georgelis oversaw sales of certain products in the lower mid-Atlantic region.  (Tr. I 22:15-21; Pl. Ex. 4).  This region included Virginia, Maryland, Delaware, the District of Columbia, and parts of Pennsylvania and West Virginia.[2] (Pl. Ex. 4 at 2).  While working for CPG, Georgelis worked from his home office in Baltimore, Maryland.  (Tr. II 64:11-23).

---

[2] Specifically, Georgelis's Pennsylvania territory included the following counties: Clinton, Lycoming, Sullivan, Centre, Union, Northumberland, Montour, Columbia, Blair, Huntingdon, Mifflin, Juniata, Snyder, Perry, Dauphin, Schuylkill, Lebanon, Berks, Bedford, Fulton, Franklin, Adams, York, and Lancaster.  (Pl. Ex. 4 at 2).  His West Virginia territory included the following counties: Pendleton, Grant, Mineral, Hardy, Hampshire, Morgan, Berkely, and Jefferson.  (Id.)

It is undisputed that, from the time he started with TimberTech, Georgelis's product line included railing and decking.  Trim and pavers were added to Georgelis's product line after the merger with CPG in 2013.  Georgelis's responsibilities included managing a team of seven sales representatives, setting the strategic direction for the region, interacting with distributors, dealers, and end users.  (Tr. I 22:15-21; Pl. Ex. 11).  Before leaving CPG, Georgelis earned $195,000 per year in 2012 and 2013, including bonuses, and in excess of $164,000 in 2014. (Tr. I 24:24-25:2).

Before working at CPG, Georgelis garnered extensive exposure to the building industry through his father, a forty-year veteran of the business.  (Tr. II 72:4-25).  Georgelis's own experience working in the field spans a broad range, having spent approximately nine years before joining CPG with Home Depot, a retailer, and McMillan Lodel Warehouser, a distributor.  (Tr. II 73:14-19; Tr. I 12:9-14).  He then worked for TimberTech and CPG for eleven years, from 2003 to 2014. (Tr. II 74:4-8).  Georgelis testified that he has developed a skill set through his many years of experience in the building materials industry that would qualify him to sell a variety of products beyond those that he

3

sold at CPG.  (Tr. II 121:6-17).

At some point prior to December 12, 2014, Georgelis received a phone call from a "head hunter," or corporate recruiter, about an opportunity at Snavely Forest Products (hereinafter "Snavely"), a distributor of building materials.  (Tr. II 70:9-17).  Georgelis applied for the position, and, on December 12, 2014, he gave a presentation to executives from Snavely in Pittsburgh as part of the interview process. (Tr. II 63:2-8; 68:3-15; 4:10-12).  The purpose of the presentation was for Snavely executives to see a demonstration of Georgelis's skills.[3]  (Id.; 4:22-5:15).

In preparing the presentation, Georgelis admittedly used a CPG lifecycle graph and CPG price data from an older CPG powerpoint presentation, after removing the CPG logos.  (Tr. II 121:19-122:3; Pl. Ex. 10, 13).  Georgelis took and used the CPG slides, he said, because it was easier and took less time than it would have to create his own slides.  (Id.) He did not request permission from anyone at CPG before using these slides in the presentation to Snavely.  (Tr. II 124:15-21).  One of the slides

---

[3]  Snavely asked Georgelis to share his ideas on how he would bring a product line called Accoya to market as part of a planned relaunch.  (Tr. II 68:3-15).

4

included unlabeled pricing data.  (Pl. Ex. 13 at 5).

In the regular course of business, Georgelis routinely accessed a Salesforce database of confidential account information gathered from CPG's sales representatives.  (Tr. I 62:17-66:2; Pl. Ex. 15, 29).  In the days leading up to the presentation, however, Georgelis accessed a significantly larger number of accounts than over the preceding year.  (Id.) Included in those accounts Georgelis accessed were 140–a disproportionately large number–located in the Southeast Region, an area outside of Georgelis's sales territory.  (Id.)  CPG and Snavely compete in the Florida dock market, which falls within the Southeast Region.  (Id.)

Defendant offered no explanation for why he accessed so many accounts outside his own territory, particularly while being courted by Snavely.  Plaintiff offered no non-speculative evidence to explain defendant's reasons for doing so either.

On the day of the presentation, Georgelis plugged a flash drive containing the slide deck, along with 130 other CPG documents and files, into a Snavely computer, which was connected to a projector.  (Tr. II 6:7-17).  Georgelis had offered to distribute handouts or copies of the presentation, but ultimately did not, and no one took notes.  (Tr. II 5:22-

5

6:6; 124:11-14).  Plaintiff presented no evidence to show that any CPG

files were copied to the Snavely computer.

Less than a week after his presentation, Snavely hired Georgelis as

a sales manager.  (Tr. II 20:3-5; 53:18-55:6).  Snavely hired Georgelis to

manage a sales force, meet with customers, and work with

manufacturers' sales representatives to gain market share among dealers

and end users for the products Snavely distributes.  (Tr. II 53:18-55:6; Pl.

Ex. 12).  Georgelis's Snavely territory covers much of the same area as

his CPG territory did, including Maryland, Delaware, the District of

Columbia, and parts of Virginia, West Virginia, Pennsylvania, and New

Jersey.  (Pl. Ex. 4 at 3).

On December 18, 2014, Georgelis notified Jim Gross, Georgelis's

immediate supervisor at CPG, that he had accepted a new position and

that he intended to end his employment with CPG in two weeks.  (Tr. II

77:1-78:6).  Gross asked whether, by taking the new position, Georgelis

would be in breach of the Agreement, and Georgelis replied that the "non-

compete would not be an issue."  (Tr. II 77:21-23).  According to

Georgelis, after he explained that his new employer would be Snavely,

Gross "quickly asked [Georgelis], Well, what branch are you going to?

6

Where are you going to go?"  (Tr. II 78:3-4).  Georgelis informed Gross

that he would be working in Snavely's Baltimore branch.  (Tr. II 78:4-6).

Gross's immediate reaction when Georgelis told him he'd be leaving to

work for Snavely was to tell Georgelis that he was leaving to work for a

competitor.  (Tr. I 54:18-23).

Georgelis then continued working through the day, communicating

with Gross multiple times.  (Tr. II 78:7-79:10).  Gross, in the meantime,

notified Human Resources, his own direct supervisor, and the CPG CEO,

and began working on a mitigation plan.  (Tr. I 55:2-22).  The plan was

most highly concerned with the distribution partners and dealers with

whom Georgelis had developed and maintained key personal

relationships.  (Id.)

At approximately 5:15 p.m. that evening, Georgelis participated in a

phone call with Gross, CPG legal counsel Brian Cooper, and CPG Human

Resources Director Sandy Jones.  (Tr. II 80:1-9).  Cooper reviewed the

solicitation and confidentiality provisions of the Agreement with Georgelis,

and Jones informed Georgelis that his employment was being terminated

immediately.  (Tr. II 81:15-16).  Georgelis was instructed to return all CPG

property in his possession, and arrangements were made for picking up

his laptop, telephone, and automobile.  (Tr. I 56:2-9; Tr. II 81:8-18).[4]

Georgelis began working for Snavely on December 19, 2014.

**The Agreement**

Georgelis signed the Agreement on August 6, 2003, his first day

with TimberTech.[5]  (Tr. II 73:24-75:10; Pl. Ex. 9).  Georgelis had never

before signed a covenant not to compete, and he did review the

Agreement before signing.  (Tr. II 74:23-75:4).  Georgelis considered

seeking advice from his father, who had several decades experience in

the building industry, regarding the meaning of the Agreement, but chose

not to do so.  (Tr. II 75:1-3).  CPG did not expressly tell Georgelis whether

he could, nor did he seek permission to, take the Agreement home and

have an attorney review it.  (Tr. II 75:16-20).  Georgelis asserts that he did

not understand certain terms in the Agreement when he signed it.  (Tr. II

_____

[4] Georgelis did not return all of CPG's property, however, turning over five flash drives on February 1, 2015, in response to a discovery request from the plaintiff.  (Tr. I 56:10-18).  A further four flash drives and one portable hard drive are still apparently unaccounted for.  (Tr. I 107:1-13).  Georgelis explained that he did not keep any CPG property intentionally, and merely overlooked the drives he has returned because they were intermingled with his personal property in his home office.  (Tr. II 63:13-64:9).

[5] The Agreement was countersigned on the same date by a TimberTech employee, but the name is illegible.  The title listed reads, in legible part, "Director of Sales."

75:21-76:22).

By its terms, signing the Agreement was a condition of Georgelis's employment, and his employment, wages, and benefits were the consideration for the Agreement.  (Pl. Ex. 9).  The Agreement is silent as to Georgelis's job title or description, salary, benefits, or the products he would be selling.  (Id.)  The choice-of-law provision states that the Agreement is governed by Ohio law.  (Id. ¶ 9).  The Agreement reserved to TimberTech the right to assign the Agreement freely, and provided that all covenants and agreements therein "shall inure to the benefit of such successor or assignee."  (Id. ¶ 10).  It is undisputed that the Agreement was assigned to CPG as a result of its merger with TimberTech.

In the Agreement, Georgelis acknowledged that he would have access to confidential information, which included marketing methods and data, sales techniques and customers, prices, products purchased by customers, and business strategies or plans.  (Id. ¶ 3).  He committed "never" to disclose such information, and to return all documents and things containing confidential information to TimberTech upon termination of his employment.  (Id.)[6]

---

[6] Specifically, his Agreement stated:

9

By reason of my employment with TimberTech I have obtained and become familiar with or I will obtain and become familiar with confidential information of TimberTech which has been developed, acquired or maintained at substantial expense and is of great value to TimberTech. "Confidential Information" means any trade secret (including, but not limited to, any information that is a trade secret within the meaning of Section 1333.61 of the Ohio Revised Code), proprietary information, or other information known or used by TimberTech in its business and which is not generally known by or available to the public (including such information which I conceived, discovered or developed). TimberTech Confidential Information includes, but is not limited to, TimberTech's research, its materials in use or in research, its manufacturing processes and techniques, its marketing methods and data, sales techniques and customers, prices, products purchased by customers, product or chemical formulas and costs, customer contacts, active or targeted customer prospects, business strategies or plans, and information received by TimberTech from third parties in confidence or subject to nondisclosure or similar agreements. I further agree that except as required by my duties at TimberTech:

a. I will never, either during my employment by TimberTech or thereafter, use or disclose any Confidential Information of TimberTech.

b. Upon termination of my employment by TimberTech, all documents and things containing Confidential Information including copies, excerpts or summaries thereof in my possession will be left with or returned to TimberTech.

10

Georgelis further agreed not to engage in any business as an employee or otherwise that competes with TimberTech in any territory where TimberTech products or services are promoted or sold, nor to solicit TimberTech customers, for two years following termination of employment.  (Id. ¶ 5).[7]

_____

> c. In order to avoid situations where I might be unable to keep my promise to safeguard Confidential Information of TimberTech, I agree that during my employment by TimberTech and thereafter, I will not become involved in any situation in which the loyal fulfillment of my duties and responsibilities in that situation would inherently call upon me to reveal or to use Confidential Information of TimberTech.

(Pl. Ex. 9 ¶ 3).

> [7] The Agreement stated:

> 5.  I agree that during my employment and for a period of two (2) years immediately following the termination of my employment with TimberTech:

> a. I will not directly or indirectly engage in any business as an employee, sole proprietor, independent contractor, partner, member, shareholder, participant in a joint venture, principal, consultant, or in any other manner, for myself or for any person or entity that competes with TimberTech (or competes with any affiliate or subsidiary of Crane Plastics Company LLC) in any territory where TimberTech-owned or TimberTech-distributed products or services (including the products or services of any affiliated or subsidiary companies of

11

Georgelis agreed to deliver a copy of the Agreement to any prospective new employer during the two-year period following separation from TimberTech.  (Id. ¶ 5(d)).  Georgelis acknowledged that "the restrictions set forth in this Agreement are reasonable and necessary for the protection of TimberTech's legitimate business interests."  (Id. ¶ 7). The Agreement provides that TimberTech's remedy at law would be inadequate for any breach of the Agreement, and that injunctive relief

_____

Crane Plastics Company LLC) are promoted or sold.

b. I will not on my own behalf or on behalf of any other person or entity, solicit, contact, call upon, communicate with or attempt to communicate with, divert, take away, attempt to divert or take away any customer or prospect of TimberTech (including any customer or prospect of any affiliated or subsidiary companies of Crane Plastics Company LLC), or any representative of any customer or prospect of TimberTech (including any representative of any customer or prospect of any affiliated or subsidiary companies of Crane Plastics Company LLC), with a view to selling or providing any product, equipment or service competitive or potentially competitive with any product, equipment or service sold or provided or under development by TimberTech (or any product, equipment or service sold or provided or under development by any affiliated or subsidiary companies of Crane Plastics Company LLC) during any part of the two (2) years immediately before the termination of my employment with TimberTech.

(Pl. Ex. 9 ¶ 5).

12

may be granted to enforce any of the provisions.  (Id. ¶ 8).

The Agreement contains a savings clause, providing that any provision found to be invalid or unenforceable should be enforced to the extent permissible by law or judicially modified if necessary to render enforcement practicable.  (Id. ¶ 7).  In the event of litigation to enforce the Agreement, a tolling provision extends the parties' obligations by the length of time of any breach.  (Id. ¶ 12).  Georgelis acknowledged that he had read and understood the Agreement, and intended to be bound by his signature.  (Pl.'s Ex. 9.)

Finally, the Agreement represents that Georgelis will not be impaired in his ability to work in his chosen field by the obligations undertaken by signing the Agreement.  (Id.)  The last paragraph of the Agreement states:

> I EXPRESSLY STATE THAT I HAVE READ, UNDERSTAND AND INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT AND ALL THE TERMS AND CONDITIONS THEREOF AS OF THE DATE OF MY SIGNATURE.  I ACKNOWLEDGE THAT I HAVE RECEIVED FULL AND ADEQUATE CONSIDERATION FOR ENTERING INTO THIS AGREEMENT. . . .  I FURTHER ACKNOWLEDGE THAT THE RESTRICTIONS SET FORTH IN THIS AGREEMENT SHALL NOT IMPAIR MY ABILITY TO SECURE EMPLOYMENT WITHIN THE FIELD OR FIELDS OF MY CHOICE INCLUDING, WITHOUT

LIMITATION, THE FIELD IN WHICH I AM, ARE TO
BE OR HAVE BEEN EMPLOYED BY THE
EMPLOYER.

(Pl. Ex. 9).  Georgelis testified that he understood the last sentence to
mean he could work at any company he chose, regardless of whether it
competed with TimberTech or CPG, or not.  (Tr. II 75:4-15).

### Confidential Information

Georgelis had access to CPG's confidential information while
working at CPG.  (See, e.g., Tr. II 99:19-22).  CPG sales representatives
and managers, including Georgelis, used Salesforce, a software platform
that facilitates the collection and aggregation of customer information.
(Tr. II 108:20-109:22).  Sales representatives make regular entries in
Salesforce, inputting information about customer identity, needs,
purchase history, prices, notes about sales strategies, and other
information gleaned through interactions with customers.  (Id.)  Such
information is confidential and not publicly available.  (Tr. II 111:2-9).
Georgelis did not download any Salesforce records, nor did he print any
records after his termination.  (Tr. II 84:23-85:4).

Georgelis also had access to, and, in some instances, helped
create, confidential information about sales strategies.  (See, e.g., Tr. II

14

108:20-109:22; 111:21-112:7).  CPG spends substantial money on a

regular basis to develop sales and marketing strategies, sometimes with

the assistance of outside consultants.  (Tr. I 62:7-16; 31:12-20).  These

are strategies and plans that Georgelis knew of and would inevitably take

with him in his memory and draw upon for the benefit of his new

employer.  As plaintiff established, it would be impossible to assign a

dollar value to the damage caused were CPG trade secrets to be

revealed.  (Tr. I 52:6-17).

Other than the slides Georgelis included in his power point

presentation, plaintiff has failed to establish that defendant has copied or

transmitted or in any other way disclosed any of CPG's confidential

information to Snavely.  With respect to the slides, plaintiff has failed to

establish that the information contained therein was not readily

ascertainable by the general public.

### Procedural History

CPG filed its complaint on January 26, 2015, seeking temporary

and permanent injunctive relief and compensatory and statutory

damages.  (Doc. 1).  Count I of the complaint alleges a claim for breach of

contract under Ohio law.  Count II contends Georgelis violated the Ohio

Uniform Trade Secrets Act.  Count III asserts a claim for unfair competition.

CPG moved the court for a temporary restraining order (hereinafter "TRO") on January 27, 2015, along with motions for an expedited hearing and expedited discovery.  (Docs. 3, 5).  The court granted expedited discovery, and, on a telephone conference, scheduled a consolidated hearing for February 3, 2015.  (Docs. 10, 11).  We ruled that the hearing would consolidate the preliminary injunction and the trial on the merits for the permanent injunction, pursuant to Federal Rule of Civil Procedure 65(a)(2), and we verbally denied the TRO at the end of the hearing.  (Doc. 10; Tr. II 131:2-9; see also Tr. I 4:9-10).

The court heard testimony on February 3 and 4, 2015, from four witnesses.  Plaintiff called James Anthony Gross, Vice President of Eastern Division Sales for CPG and Georgelis's supervisor, and Christopher Scott Tragasz, testifying as an expert in computer forensic examinations.  (Tr. I 17:1-4, 100:18-22).  Defendants called Clark Spitzer, Senior Vice President of Snavely, in charge of Marketing and Eastern Distribution, and Defendant Georgelis.[8]  (Tr. I 3:16-23; 62:5).  The parties

---

[8] Plaintiff intended to call Defendant Georgelis as a hostile witness as part of its case in chief.  In the interest of expediency, the court

16

submitted post-trial briefs, and the matter is now ripe for our decision.

**Jurisdiction**

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332.  CPG is incorporated under the laws of the State of Delaware with its headquarters in Scranton, Pennsylvania.  (Doc. 1, Compl. ¶¶ 26-27).  The defendant is a citizen of Maryland.  (Tr. II 64:11-14).  Additionally, the amount in controversy exceeds $75,000.  (Doc. 1, Compl. ¶ 34).  Because complete diversity of citizenship exists among the parties and the amount in controversy exceeds $75,000, the court has jurisdiction over this case.  See 28 U.S.C. § 1332 ("district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states [.]")

**Legal Standard**

Plaintiff has the burden of proving its case by a preponderance of the evidence.  Plaintiff meets this burden when, in light of all the evidence, it establishes that what it claims is more likely so than not so.  Laskowski v. U.S. Dept. of Veterans Affairs, 918 F.Supp.2d 301 (M.D. Pa. 2013)

---

allowed plaintiff to instead question Georgelis beyond the scope of direct examination on cross.

17

(citing Greenwich Collieries v. Dir., Office of Workers' Comp., 990 F.2d 730, 736 (3d Cir. 1993)).

In determining whether any fact has been proven by a preponderance of evidence in this case, we have considered the testimony of all witnesses, both plaintiff witnesses and defense witnesses. We have also examined all exhibits received in evidence, whether presented by the plaintiff or defendant.

**Discussion**

CPG filed a three-count complaint of January 26, 2015, seeking injunctive relief and compensatory and statutory damages.  Count I of the complaint alleges a claim for breach of contract under Ohio law.  Count II contends Georgelis violated the Ohio Uniform Trade Secrets Act.  Count III asserts a claim for unfair competition.  The court will address each count in turn.

**Count I: Breach of Contract**

Plaintiff alleges defendant breached the Agreement, and seeks a permanent injunction to redress the harm caused by that breach. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may

18

grant such relief." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391

(2006).  A plaintiff must demonstrate: (1) that it has suffered an

irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that,

considering the balance of hardships between the plaintiff and defendant,

a remedy in equity is warranted; and (4) that the public interest would not

be disserved by a permanent injunction. Id.  "The decision to grant or

deny permanent injunctive relief is an act of equitable discretion by the

district court, reviewable on appeal for abuse of discretion." Id.

### A. Irreparable Injury Resulting From Breach of the Agreement

Plaintiff alleges it has suffered and will continue to suffer irreparable

injury as a result of defendant's breach of the Agreement.  Plaintiff seeks

an order enjoining defendant from working for Snavely or any other

company that sells products that compete with CPG's for a period of two

years.[9]

Defendant counters that plaintiff has suffered no irreparable injury,

because the Agreement is not a valid contract, and, if the Agreement is a

---

[9] In post-trial briefing, plaintiff seems to concede that any irreparable harm CPG might suffer would be limited to Georgelis "selling or supervising others selling competing products to CPG's same customers in the same region" as he did for CPG.  (Doc. 31 at 4).

valid contract, Georgelis did not breach the Agreement.[10]  We will address

each argument in turn.

### 1. Agreement is a valid contract.

We first examine the Agreement to determine whether it is valid as

a matter of contract law.  As noted above, we apply Ohio law to this

contract.  "A contract is generally defined as a promise, or a set of

promises, actionable upon breach.  Essential elements of a contract

include an offer, acceptance, contractual capacity, consideration (the

bargained for legal benefit and/or detriment), a manifestation of mutual

assent and legality of object and of consideration."  Rayess v. Educ.

Comm'n for Foreign Med. Graduates, 983 N.E.2d 1267, 1271 (Ohio

2012).  Here, the only element the parties dispute is whether the

Agreement is void for lack of consideration.

Defendant argues that the Agreement is void because he was

provided with no additional consideration when the lineup of products

Georgelis was tasked with selling changed after CPG took over

TimberTech.  After the merger, Georgelis began selling trim and pavers in

---

[10] Plaintiff further alleges that defendant breached the Agreement by misappropriating confidential information.  We address this issue in Section II, *infra*.

20

addition to decking and railing.  (Tr. II 104:2-5).  Defendant relies solely

on Maintenance Specialities Inc. v. Gottus, 314 A.2d 279 (Pa. 1974) to

support the proposition that because there was a change in Georgelis's

job description, CPG would have had to have provided additional

consideration to keep the Agreement in effect.  Gottus is a Pennsylvania

case, and therefore inapplicable in determining the validity of a contract

formed under Ohio law.

Further, Gottus holds only that when parties do not enter into an

agreement not to compete as a prerequisite for employment, but instead

do so later in the employment relationship, some beneficial change in the

employee's status is required as consideration for the agreement to be

enforceable.  Id. at 281.  This is but common-sense contract law, that

when parties enter a contract, consideration is required.  RESTATEMENT

(SECOND) OF CONTRACTS § 17 (1981).  Thus, even if  Gottus was Ohio

law, it would be inapplicable to the case at bar, where the consideration

was Georgelis's employment.

Under Ohio law, even if the merger between TimberTech and CPG

somehow created a new Agreement, Georgelis's continued employment

is sufficient consideration.  Where an at-will employee enters into a

21

noncompetition agreement with his or her employer in exchange for the

employer continuing the at-will employment relationship, consideration

exists.  Lake Land Empl. Grp. of Akron, LLC v. Columber, 804 N.E.2d 27,

27, 32 (Ohio 2004).

Here, however, there was no new Agreement, and there was no

change in employment status relevant to the Agreement that Georgelis

signed.  The Agreement, by its terms, is not limited to any particular

products to be sold or, indeed, any job description whatsoever.  The

Agreement applied to Georgelis's entire tenure as an employee with

TimberTech and its successors, and, therefore, the original consideration

was sufficient to bind him to that Agreement for the intended duration.

Accordingly, the Agreement is a valid contract.

### 2. Defendant breached the Agreement.

The parties do not dispute that Georgelis left his employment with

CPG to work for Snavely.  CPG alleges that in doing so, Georgelis

breached the Agreement because Snavely competes with CPG.

Georgelis first argues that he did not breach the agreement because

Snavely is a distributor and CPG is a manufacturer, and therefore the two

companies cannot, by definition, be competitors.  Defendant further

argues he is not in breach because the Agreement's final paragraph allows him to work for whatever employer he chooses.  The court finds defendant's arguments unconvincing.

### a. Snavely competes with CPG.

First, plaintiff presented evidence that established that CPG and Snavely sell competing products in the same territory to the same customers, and argues that they are therefore competitors.  Without reference to a single legal authority, defendant counters with the proposition that a manufacturer and a distributor cannot compete with one another.  Thus, defendant argues, because CPG is a manufacturer, and Snavely is a distributer, they cannot be considered competitors, and he did not breach the Agreement by leaving CPG to work for Snavely.

Defendant's argument overruns case law, oversimplifies the circumstances of this case, and overlooks the simple reality that Georgelis cannot do the job he was hired by Snavely to do without competing with CPG.  Whether the former and new employers can be categorized as the same type of business is entirely irrelevant to the analysis of whether they "compete" in the marketplace.

Ohio law provides that competition is a "rivalry between two or more

businesses striving for the same customers or market." <u>Single Source</u>

<u>Packaging, LLC v. Cain</u>, No. 2003CA14, 2003 WL 22064129, at *24 (Ohio

Ct. App. Sept. 5, 2003) (quoting WEBSTER'S II NEW COLLEGE DICTIONARY

at 229 (1995)).  "Thus, two primary considerations to be considered in

determining whether competition has occurred in violation of a covenant

not to compete are whether the covenantor is doing business in the same

marketing area with the same potential customers of the covenantee." <u>Id.</u>

(citing <u>Adver. Distrib. of Am. vs. Nurrenbrock</u>, 1981 WL 2871, at *2 (Ohio

Ct. App. Aug. 7, 1981)).

There is no question, based on the evidence adduced at trial, that

CPG and Snavely seek to sell competing products to the same customers

in the mid-Atlantic region.  CPG manufactures and sells building material

products, including decking, railing, trim, and pavers.  (<u>Id.</u>)  CPG partners

with distributors to sell CPG's products to dealers.  (<u>Id.</u> at 17:17-18:2).

Together, CPG and their distributor partners seek to increase market

share for CPG products, primarily by securing shelf space at dealer

establishments such as retail stores and professional lumber yards.  (<u>Id.</u>

at 17:17-18:2; 19:6-20).  To this end, CPG's sales force, seventy

representatives nationwide, work with distributor representatives to

implement sales strategies, including meeting directly with potential dealer customers.  (Id.)

Snavely is a distributor of building material products.  (Tr. II 8:18-21).  Snavely partners with manufacturers to sell their products to dealers. (Tr. II 7:25-8:11).  Just like CPG, Snavely works with their partners to increase market share for their partners' products, primarily by securing shelf space with the same dealers.  (Id. at 34:14-20).  Snavely's sales representatives work with manufacturer representatives to achieve this goal, at times meeting with potential dealer customers.  (Id. at 29:5-12).

In the business model described above, the interests of the manufacturer and their partner distributors are aligned, because both are working toward the goal of maximizing sales down the channel.  (Tr. II 29:13-16).  In a single territory, located in Texas, CPG partners with Snavely to sell CPG products.  (Tr. I 18:3-25).  In all other areas in which they both operate, Snavely partners with manufacturers other than CPG to sell products that compete with CPG's.  (Id.; Tr. II 34:12-20). Therefore, Snavely's and CPG's interests, in all but the Texas market, directly conflict.[11]

---

[11] Part of Georgelis's job as a manufacturer's representative with CPG was to help CPG's distributor partners (Snavely's competitors) in the

Moreover, in the mid-Atlantic territory where Georgelis worked for CPG and has been working for Snavely since December 19, 2014, CPG partners with the distributors Rocco, Parksite, and Huttig, to sell the CPG products TimberTech deck, TimberTech and Azek rail, Azek trim, and Azek porch (hereinafter, collectively "the CPG products"). (Pl. Ex. 21). In that same territory, Snavely partners with the manufacturers Trex, Palram, and Aeratis, to sell Trex deck, Trex rail, Palram PVC trim, and Aeratis porch (hereinafter, collectively "the Snavely products"). (Id.) It is undisputed that the CPG products compete with the Snavely products. (Tr. II 30:4-21; Pl. Ex. 21). In particular, Trex deck is CPG's biggest manufactured deck competitor. (Tr. I 20:16-24).

Accordingly, the court finds that Snavely and CPG are competitors in the Mid-Atlantic market for sales of deck, rail, trim, and porch products. By the terms of the Agreement, Georgelis is prohibited from engaging in any business for a competitor of CPG. Therefore, Georgelis has breached the Agreement by working for Snavely, and the breach is particularly material because Snavely hired Georgelis to facilitate that competition by selling the same kinds of products as he did for CPG, in

---

Mid-Atlantic region to build their brand in the market through distribution. (Tr. II 14:3-11).

the same territory, to the same customers.

**b. The Agreement does prohibit employment with a competitor.**

Defendant next argues that, even if Snavely is a CPG competitor,

he has not breached the Agreement because its final paragraph allows

him to work for whatever employer he chooses, without limitation.

The final paragraph of the Agreement states:

> I EXPRESSLY STATE THAT I HAVE READ,
> UNDERSTAND AND INTEND TO BE LEGALLY
> BOUND BY THIS AGREEMENT AND ALL THE
> TERMS AND CONDITIONS THEREOF AS OF THE
> DATE OF MY SIGNATURE.  I ACKNOWLEDGE
> THAT I HAVE RECEIVED FULL AND ADEQUATE
> CONSIDERATION FOR ENTERING INTO THIS
> AGREEMENT. . . .  I FURTHER ACKNOWLEDGE
> THAT THE RESTRICTIONS SET FORTH IN THIS
> AGREEMENT SHALL NOT IMPAIR MY ABILITY TO
> SECURE EMPLOYMENT WITHIN THE FIELD OR
> FIELDS OF MY CHOICE INCLUDING, WITHOUT
> LIMITATION, THE FIELD IN WHICH I AM, ARE TO
> BE OR HAVE BEEN EMPLOYED BY THE
> EMPLOYER.

(Pl. Ex. 9).  Georgelis testified that he believed this paragraph meant that

he could not be limited in his choice of employer, even if such an

employer competed with CPG or TimberTech.  (Tr. II 75:4-15).

The provision makes no mention of companies or employers of

Georgelis's choosing, but rather states that he would not be impaired from

working in the "field" he chose.  The Oxford English Dictionary defines "field," in relevant part, as "An area or sphere of action, enquiry, or interest; a (wider or narrower) range of opportunities, or of objects, for activity or consideration; a theme, a subject."  OXFORD ENGLISH DICTIONARY ONLINE (2015).  When the Agreement referred to the "field" of Georgelis's choice, it referred to the area or sphere of action or interest in which he chooses to seek employment; a "range of opportunities," not a specific job or employer.

When read in context, consistent with the whole of the Agreement, we find that the only reasonable interpretation of this provision is that CPG has no right to prevent Georgelis from working in the field of building material sales.  It cannot mean that he is free to work for a competitor, because that would negate the substance of a major component of the Agreement, an absurd result.

"In interpreting a contract, we are required, if possible, to give effect to every provision of the contract. If one construction of a doubtful condition written in a contract would render a clause meaningless and it is possible that another construction would give that same clause meaning and purpose, then the latter construction must prevail."  Sunoco, Inc.

(R&M) v. Toledo Edison Co., 953 N.E.2d 285, 295 (Ohio 2011).  The final

paragraph unambiguously pertains to the field in which Georgelis works,

and does not permit him, without limit, to flout the preceding twelve

provisions and work for whomever he chooses.  We hold that defendant's

reading of the final paragraph of the Agreement is inaccurate as a matter

of law, and does not rescue him from his state of breach.

### B. Remedies at law are inadequate to compensate plaintiff.

A breach of the Agreement is not enough on its own to compel the

court to issue injunctive relief.  Plaintiff must establish that it would suffer

irreparable harm if the Agreement is not enforced.  We find that CPG has

carried its burden here.

"Irreparable harm is 'a potential harm which cannot be redressed by

a legal or equitable remedy following a trial.'"  Radian Guar., Inc. v. Bolen,

2014 WL 2777450, at *9 (E.D. Pa. June 19, 2014) (quoting Instant Air

Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989)).  To

obtain injunctive relief, a plaintiff must make a "clear showing of

immediate irreparable injury," or a "presently existing actual threat; [an

injunction] may not be used simply to eliminate a possibility of a remote

future injury[.]"  Acierno v. New Castle Cnty., 40 F.3d 645, 655 (3d Cir.

1994).  In a breach of contract action, monetary loss is not sufficient to

show irreparable harm, but the Court will consider "'(a) the difficulty of

proving damages with reasonable certainty, (b) the difficulty of procuring a

suitable substitute performance by means of money awarded as

damages, and (c) the likelihood that an award of damages could not be

collected.'" Instant Air Freight at 802 (quoting RESTATEMENT (SECOND) OF

CONTRACTS § 360 (1981)).

CPG demonstrated that Georgelis had access to, and at times,

developed, confidential strategies and plans for the sales of their

products.  Further, Georgelis developed and cultivated relationships with

customers at the dealer level to facilitate sales of CPG products.  Snavely

hired Georgelis to fulfill the same role in selling and supervising the selling

of products distributed by Snavely, products that compete with CPG's in

the mid-Atlantic region.

If Georgelis is permitted to work for Snavely in that capacity, CPG

would suffer irreparable harm through the loss of customers whose

relationships with Georgelis–relationships developed in the employ and

for the benefit of CPG–would render them susceptible to his solicitations

on Snavely's behalf.  Such harm would not be remediable by money

damages, because CPG would have no way of proving that any particular

lost sale was attributable to Georgelis's unfair competition.  CPG would

be put at a competetive disadvantage that legal remedies would not be

able to redress.

Further, the "inevitable disclosure doctrine" establishes the element

of irreparable harm.  Third Circuit courts have found that an employer

suffers irreparable harm where an employee who has had access to the

employer's confidential information goes to work for a competitor under

circumstances in which the employee is likely, if not certain, to use that

information to compete with his original employer.  "Because he was

exposed to confidential information about [his employer's] sales,

marketing, and pricing strategies," Georgelis "would be likely to use that

information, either consciously or not, when competing against" CPG in

selling building products.  WebMD Health Corp. v. Dale, 2012 WL

3263582, at *12 (E.D. Pa. Aug. 10, 2012); see also Bimbo Bakeries USA,

Inc. v. Botticella, 613 F.3d 102 (3d Cir. 2010) (noting that the inevitable

disclosure of trade secrets placing the former employer at a competitive

disadvantage establishes irreparable harm); Radian Guar., 2014 WL

2777450 at *10-11 (finding irreparable harm when the former employee's

knowledge of his former employer's strengths, weaknesses, and business practices would necessarily inform the way that she would manage her new employer's sales team which competes with her former employer). Here, in addition to confidential information, Georgelis would inevitably take advantage of those customer relationships cultivated for CPG in his new role with Snavely.

Finally, Georgelis stipulated to the nature of the type of harm his employer would face if he breached the Agreement.  The Agreement states that TimberTech's remedy at law would be inadequate for any breach of the Agreement, and that injunctive relief may be granted to enforce any of the provisions therein.  (Pl. Ex. 9 ¶ 8).  Such a contractual provision is not sufficient on its own to obtain relief, but it does constitute "one factor that weighs in favor of finding irreparable harm."  WebMD Health Corp. at *12.

For the reasons discussed above, we find that CPG has carried its burden to establish that remedies at law are unable to compensate plaintiff for the harm that has been and will be caused by defendant's breach.

### C. Balance of Hardships

Plaintiff must next establish that the balance of harms weighs in favor of granting that relief.  Specifically, plaintiff must demonstrate that enforcement of the Agreement will go no further than necessary to protect plaintiff's interests, and that it does not unduly burden defendant's ability to make a living.

Defendant argues that plaintiff has failed to carry this burden because the Agreement is unreasonable in scope regarding time, geographic area, and products covered.  Defendant argues that the scope of the Agreement is unreasonable because it goes beyond what is necessary to protect CPG's business interests and is overly burdensome on his own ability to make a living.

It is undisputed that the Agreement should be "interpreted, construed, and enforced in accordance with the laws of the State of Ohio."  (Pl. Ex. 9 ¶ 9).  "In Ohio, non-compete agreements that are reasonable are enforced, and those that are unreasonable are enforced to the extent necessary to protect an employer's legitimate interest."  P&G v. Stoneham, 747 N.E.2d 260, 270 (Ohio Ct. App. 2000) (internal quotes omitted).

The Supreme Court of Ohio set forth the current standard for review

and enforcement of agreements not to compete in <u>Raimonde v. Van</u>

<u>Vlerah</u>, 325 N.E.2d 544 (Ohio 1975).  Essentially, the <u>Raimonde</u> test

applies the balance of harms analysis required under the permanent

injunction analysis.

The Court in <u>Raimonde</u> held that "a covenant not to compete which

imposes unreasonable restrictions upon an employee will be enforced to

the extent necessary to protect the employer's legitimate interests." <u>Id.</u> at

25-26.  Such a covenant is reasonable if "it is no greater than is required

for the protection of the employer, [and] does not impose undue hardship

on the employee . . . ."[12] <u>Id.</u> at 26.

The <u>Raimonde</u> court directed that "Courts are empowered to modify

or amend employment agreements to achieve such results." <u>Id.</u>  The

court provided factors for consideration in refashioning, if necessary, a

covenant not to compete in order to render it reasonable:

> The absence or presence of limitations as to time and
> space, . . . whether the employee represents the sole
> contact with the customer; whether the employee is
> possessed with confidential information or trade
> secrets; whether the covenant seeks to eliminate

---

[12] <u>Raimonde</u> incorporated a third element in its test: that a covenant may not be "injurious to the public." <u>Raimonde</u> at 26.  This element is identical to the public harm element of the permanent injunction standard, and is addressed below.

> competition which would be unfair to the employer or
> merely seeks to eliminate ordinary competition;
> whether the covenant seeks to stifle the inherent skill
> and experience of the employee; whether the benefit
> to the employer is disproportional to the detriment to
> the employee; whether the covenant operates as a
> bar to the employee's sole means of support; whether
> the employee's talent which the employer seeks to
> suppress was actually developed during the period of
> employment; and whether the forbidden employment
> is merely incidental to the main employment.

Id. at 25.

### 1. Time Scope

In the instant case, defendant takes issue with the two-year bar on competition and solicitation to which he agreed.

Defendant first argues that other CPG employees have agreed to one-year terms, and thus these other agreements evidence that CPG does not actually believe its interests can only be protected by a two-year period of non-competition and non-solicitation.  We disagree.

First, defendant has provided no evidence that the other employees who received one-year agreements have the same qualifications and responsibilities as defendant.  Nor has he established that CPG did not agree to longer agreements in exchange for some bargained-for benefit, such as lower salary or fewer benefits.

35

We have heard nothing upon which to base a finding that
Georgelis's two-year Agreement is in any way comparable to the one-year
agreements of other employees.  To do so in absence of evidence would
be arbitrary and speculative.

Second, under Ohio law, agreements not to compete for periods of
two years or greater are regularly held to be reasonable when the
circumstances merit.  <u>See</u>, <u>e.g.</u>, <u>Am. Healthcare Servs. v. Ngozi
Akabuaku</u>, No. 10AP-777, 2010 WL 4705148, at *5 (Ohio Ct. App. Nov.
18, 2010) (affirming trial court's judgment, where trial court held that a
non-compete agreement's "two-year period is typical" and enforceable);
<u>P&G v. Stoneham</u>, 747 N.E.2d 268, 276 (Ohio Ct. App. 2000) (holding
three-year non-competition agreement for marketing manager valid and
enforceable); <u>Shury v. Rocco</u>, No. 138050, 1989 WL 30538, at *3-4 (Ohio
Ct. App. 1989) (holding two-year covenant valid and enforceable); <u>Chi.
Title Ins. Corp. v. Magnuson</u>, 487 F.3d 985, 992-93 (6th Cir. 2007)
(finding a five-year covenant not to compete was reasonable for at least
two years).

Defendant next argues that a two-year non-competition and non-
solicitation period is unreasonable because it is greater than what CPG

36

requires to protect its interests and is overly burdensome on his ability to make a living. Defendant argues that two years is more than CPG needs because of the constantly changing nature of the confidential information to which Georgelis was exposed. After careful review of the evidence, we agree that two years is an unreasonable period under the circumstances, and will reduce the time span of the bar on competition to one year.

CPG demonstrated that if Georgelis is permitted to work for Snavely without delay, selling the same products in the same region to the same customers, CPG is at risk to lose those customers to Snavely. CPG presented evidence that Georgelis has spent over a decade establishing customer relationships on behalf of CPG, and his new position would require him to usurp those relationships on behalf of Snavely. He would do so knowing what CPG's sales strategies were when he left, and, to a certain extent, where CPG's plans would take them in the near future.

Because CPG has established that they have a legitimate business interest that would be irreparably harmed if Georgelis is allowed to immediately work for Snavely, we hold that the covenant not to compete with CPG nor to solicit CPG's customers will be enforced. CPG has not, however, demonstrated by a preponderance of the evidence that two

years is not greater than necessary for the protection of CPG, and therefore reasonable as a matter of law.

Ohio law requires a "reasonable relationship between the period of prohibition and [the employer's] business interests." <u>Life Line Screening of Am., Ltd. v. Calger</u>, 881 N.E.2d 932, 941 (Ohio Com. Pl. 2006).  One year will provide CPG with enough time to shore up customer relationships managed by Georgelis before he is allowed to attempt to lure their business away to Snavely or any other competitor, thereby safeguarding CPG's business and valuable goodwill.  Because CPG's interests can be protected by a shorter period, a two year period would be unreasonable as it would unnecessarily burden the defendant's ability to make a living.  Therefore, we will limit the duration of the covenant not to compete or solicit to a one-year period.

## 2. Geographic Scope and Products Covered

Defendant next contends that the Agreement is unreasonable in its geographic scope and in barring Georgelis from selling all products that CPG sells or might sell in the future.  Plaintiff seems to concede in its post-trial brief that the true crux of the risk CPG faces from Georgelis working for a competitor would be that "CPG will suffer irreparable harm if

Georgelis is not required to abide by his Agreement and enjoined from selling or supervising others selling *competing products* to CPG's *same customers* in the *same region* in his new role for Snavely." (Doc. 31, Pl's Br. at 4) (emphasis added). In any event, Mr. Gross testified that selling building products other than those manufactured by CPG, such as doors, windows, or roofing products, would be permissible under the Agreement. (Tr. I 46:18-47:3).

Ultimately, CPG's evidence failed to establish any threat from Georgelis selling 1) any product that does not compete with CPG's products, whether in the mid-Atlantic region or elsewhere, or 2) any product outside of the mid-Atlantic region and to customers other than those to whom he would have been selling CPG's products. Thus, we find that the geographic scope and products covered in the Agreement are unreasonable, and must be altered under Ohio law to be enforceable.

In order to protect CPG's legitimate interests, we need only enjoin Georgelis from selling or supervising others who would sell any products CPG sold as of the day Georgelis's employment ended, within the territory Georgelis covered as a CPG employee, and to any CPG customer for whose account Georgelis was or would have been responsible.

The second prong of the Raimonde test requires the court to assess the burden imposed upon the employee by enforcement of the Agreement.  The burden of proof on this prong falls upon the employee. Life Line Screening of Am., Ltd. v. Calger, 881 N.E.2d 932, 941 (Ohio Com. Pl. 2006) (citing Am. Logistics Group, Inc. v. Weinpert, No. 85041, 2005 WL 2240987 (Ohio Ct. App. Sept. 15, 2005)); see also Brentlinger Ents. v. Curran, 752 N.E.2d 994, 1004 (Ohio Ct. App. 2001) (auto salesman who sold European automobiles is not prevented from making a living under an agreement not to compete that bars him from selling European cars for a competitor, as he can effectively sell in the general auto market, and only a small percentage of dealers in that field are eliminated under the agreement).  As Ohio law provides,

> To be sure, any person who is prevented from practicing his profession or trade for a period of time in an area in which it has been practiced, suffers some hardship. However, the Raimonde test requires more than just some hardship . . . .  Too often courts have attempted to rewrite contracts for parties that appear after the fact to be more equitable to one or more of the parties.  The Raimonde opinion acknowledges that temptation and its test should therefore be strictly applied.

Calger at *18 (citing Robert W. Clark, M.D., Inc. v. Mt. Carmel Health,706 N.E.2d 336, 342 (Ohio Ct. App. 1997)).

Refashioned in the manner described above, the Agreement does not impose undue hardship on Georgelis.  He is still able to work in the building material industry, in sales, and in the geographic territory in which he has previously worked.  Or, if he chooses, he can work outside of the mid-Atlantic area, and sell the same types of products he once sold for CPG to new customers.  Further, he need not end his employment with Snavely, so long as he does not sell products that compete with CPG products (as of the date of his termination from CPG) to CPG customers in the mid-Atlantic territory.  Georgelis himself concedes that his skill set qualifies him to sell a variety of building materials products beyond those that he sold at CPG.  (Tr. II 121:6-17); see Shury v. Rocco, 1989 WL 30538, at *3 (Ohio Ct. App. Mar. 30, 1989) (finding that enforcement of the covenant will not stifle defendant's inherent skills and experiences, nor will it deprive him of his sole means of support.).  Therefore, we hold that Georgelis's ability to make a living is not overly burdened.

### D. Public Harm

Finally, defendant has raised no potential harm to the public if we enforce the Agreement.  "As a rule, Ohio law finds the enforcement of contractual obligations to be of itself an important social policy interest."

Calger at *18 (citing Blakeman's Valley Office Equip., Inc. v. Bierdeman,

786 N.E.2d 914, 920 (Ohio Ct. App. 2003)).  The court foresees no

looming deleterious effects on the marketplace or on free enterprise as a

result of our enforcing the Agreement, particularly considering the

limitations we have imposed, nor does this set any kind of dangerous

precedent.  See, e.g., Acordia of Ohio, L.L.C. v. Fishel, 978 N.E.2d 823,

830-31 (Ohio 2012); Garrison & Wendt, The Evolving Law of Employee

Noncompete Agreements: Recent Trends and an Alternative Policy

Approach, 45 Am. Bus. L. J. 107, 114-116 (2008).

Because plaintiff has carried its burden to prove 1) that the

Agreement is valid; 2) defendant has breached the Agreement; 3) as a

result of defendant's breach, plaintiff will suffer irreparable harm if the

Agreement is not enforced; 4) remedies at law, such as money damages,

are inadequate to compensate the plaintiff for such harm; 5) the

defendant will not be unduly burdened by an order enforcing the

Agreement within the limitations the court will set; and 6) enforcement is

in the public interest, we find in favor of the plaintiff on Count I of the

complaint (Doc. 1).

The court will grant a permanent injunction enjoining defendant from

competing with CPG by selling or supervising the selling of products that

compete with CPG's (as of his last day of employment with CPG), within

the same mid-Atlantic territory and to any of the same customers he had

contact with on behalf of CPG, for a period of one years.  Under the tolling

provision in the Agreement (Pl. Ex. 9 ¶ 12), the one-year period will begin

to run on the date of the court's injunctive order.

**Count II: Ohio Uniform Trade Secrets Act**

In Count II of its complaint, plaintiff alleges that defendant wilfully

and maliciously "misappropriated, misused, and likely disclosed" CPG's

trade secrets in violation of the Ohio Uniform Trade Secrets Act

(hereinafter "OUTSA"), Oh. Rev. Code Section 1333.61, et seq.  (Doc. 1

¶¶ 121-129)

OUTSA protects businesses' trade secrets, defined as:

> information, including the whole or any portion or
> phase of any scientific or technical information,
> design, process, procedure, formula, pattern,
> compilation, program, device, method, technique, or
> improvement, or any business information or plans,
> financial information, or listing of names, addresses,
> or telephone numbers, that satisfies both of the
> following:
> (1) It derives independent economic value, actual or
> potential, from not being generally known to, and not
> being readily ascertainable by proper means by, other
> persons who can obtain economic value from its

disclosure or use.
(2) It is the subject of efforts that are reasonable
under the circumstances to maintain its secrecy

OH. REV. CODE § 1333.61(D).

Georgelis clearly had access to confidential information as defined

in the Agreement.[13]  What is less clear is 1) whether the secrets CPG has

identified are trade secrets under OUTSA, and 2) whether Georgelis has

shared trade secrets with Snavely.  After careful review, we find that

plaintiff has failed to establish that the defendant has misappropriated

_____

[13]  According to the Agreement,
'Confidential Information' means any trade secret
(including, but not limited to, any information that is a
trade secret within the meaning of Section 1333.61 of
the Ohio Revised Code), proprietary information, or
other information known or used by TimberTech in its
business and which is not generally known by or
available to the public (including such information
which I conceived, discovered or developed).
TimberTech Confidential Information includes, but is
not limited to, TimberTech's research, its materials in
use or in research, its manufacturing processes and
techniques, its marketing methods and data, sales
techniques and customers, prices, products
purchased by customers, product or chemical
formulas and costs, customer contacts, active or
targeted customer prospects, business strategies or
plans, and information received by TimberTech from
third parties in confidence or subject to nondisclosure
or similar agreements.
(Pl. Ex. 9 ¶ 3).

44

trade secrets.

Plaintiff did establish that the defendant accessed data related to customers outside his sales territory prior to his departure from CPG, and after he began discussions with Snavely about obtaining a job.  These files would likely constitute trade secrets belonging to CPG, because the data therein were valuable to CPG by being not generally known or available, and were subject of efforts to keep them secret.  The court has seen no evidence, however, that Georgelis downloaded or printed any of these files.  Plaintiff has submitted no evidence that Georgelis provided copies of any of CPG's files to Snavely, or that he has retained or communicated any of the detailed information from Sales Force.

Plaintiff requested that the court grant an adverse inference against defendant because Snavely refused to produce his current work computer for forensic analysis.  We deny that request.  We decline to punish Georgelis for a decision that was, at the very least, not entirely within his power to make.  Snavely is not a party to this matter, and we will not hold their refusal to produce the laptop against Georgelis; it would be unjust. Moreover, there are many possible reasons why a company might be reticent to turn over a computer that likely contains proprietary or

45

confidential information to a competitor to comb through.  We cannot conclude that the most likely reason they withheld the computer was to conceal evidence of CPG information on Georgelis's Snavely computer.

While the court strongly suspects that Georgelis's activity in accessing accounts beyond his mandate was not driven by a desire to further CPG's business interests, we cannot find that plaintiff proved by a preponderance of the evidence that Georgelis misused or misappropriated this information.  While it is true that defendant offered no explanation for his actions, neither did plaintiff ask him for his reasons. We are left with only suspicion and speculation, but no evidence.  In any event, the risk that Georgelis might disclose or misuse this information during the course of his employment with Snavely is sufficiently mitigated by enforcement of the Agreement.

The only other instance of alleged misappropriation plaintiff points to is the presentation Georgelis made to Snavely using CPG slides.   While Georgelis admits he used CPG confidential information to create those slides, which in itself constitutes a breach of the Agreement, the parties' evidence conflicted as to whether the data in the slides was a trade secret under OUTSA.  It is unclear whether the pricing data Georgelis used was

derived from publicly available information.  The court heard conflicting testimony, of equal weight, as to whether this data was a CPG trade secret or publicly available.  (compare Tr. I 60:18-61:18, with Tr. II 123:9-17).  We remain unconvinced that the data is not readily ascertainable from public sources.

Likewise, defendant presented evidence that slide presentations such as the one Georgelis plagiarized are routinely displayed at conferences where individuals, such as vendors and hotel staff, can view them or hear their contents, without signing confidentiality agreements. (Tr. I 74:24-75:22).  This would tend to demonstrate at best a lack of effort to keep them secret, or at worst for CPG, a deliberate release of the presentations to the public.  Either way, the plaintiff has not established that the slides nor the data contained therein were trade secrets under OUTSA.

Finally, we find that plaintiff has failed to prove beyond a preponderance of the evidence that any of Georgelis's actions were undertaken with malice.  We doubt whether he intended to do anything more than obtain a new position to better benefit himself and his family. Georgelis testified that he believed what he was doing was not a violation

47

of the Agreement.  While we have ruled that he was wrong as a matter of law, we find defendant's testimony credible, and, having seen no evidence to the contrary, we take him at his word that his actions were not willful.

In light of these findings, we hold that plaintiff has no viable claim under OUTSA, and we find in favor of the defendant on Count II of the complaint.

**Count III: Unfair Competition**

The plaintiff's allegations of unfair competition in Count III of the complaint are identical in substance to those raised under Counts I and II, except that plaintiff claims unspecified "compensatory damages" in addition to irreparable harm.  To the extent that plaintiff has established that defendant has engaged or likely will engage in unfair competition with CPG, the injunctive relief granted under Count I is a sufficient remedy to make plaintiff whole.  Because plaintiff has established that any harm to CPG's customer relationships, current or prospective, goodwill, or other business interests are impossible to calculate in economic terms and irreparable by any means other than injunctive relief, plaintiff's request for money damages is denied.

**Conclusion**

For the reasons set forth above, we find in favor of the plaintiff on Count I, and in favor of the defendant on Count II.  We find that Count III is subsumed in the first two counts, and is therefore moot.  An appropriate order follows.

**Date:4/20/2015**                          **s/ James M. Munley**
                                             **JUDGE JAMES M. MUNLEY**
                                             **United States District Court**

49